| | | |
|---|---|---|
| EX PARTE IN THE MATTER | * | IN THE |
| OF THE APPLICATION OF | * | CIRCUIT COURT |
| THE STATE OF MARYLAND | * | FOR |
| FOR ORDERS | * | BALTIMORE CITY |
| AUTHORIZING THE INTERCEPTION | * | IN THE |
| OF WIRE AND ELECTRONIC | * | STATE OF MARYLAND |
| COMMUNICATIONS | * | |
| OVER TELEPHONE NUMBER | * | |
| 443-452-3541 | * | |
| UFMI# 164*1014*9291 | | |
| IMSI# 316010166478723 | * | |
| (D-Line) | | |

\* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT

William Spencer, Affiant, a Detective with the Baltimore Police Department (hereinafter "BPD"), Kenneth Ramberg, co-Affiant, a Detective with the BPD being duly sworn, depose and state:

## INTRODUCTION

1.      Affiant, Detective William Spencer, has been a duly sworn member of the Baltimore Police Department since December 1, 2003, and is an "investigative or law enforcement officer" within the meaning of section 10-401(6) of the Courts and Judicial Proceedings Article of the Maryland Code (herein after "Courts Article"), that is, a sworn law enforcement officer of the State or a political subdivision of the State, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in Title 10 of the Courts Article.

1

USA-003802

2.    Affiant, Detective William Spencer, is currently assigned to BPD's Violent Crime Impact Section. Your Affiant has been previously assigned to Patrol, Northern District Drug Enforcement Section and the Organized Crime Division. Your Affiant's current assignment involves the investigation of violent offenders, drug organizations and undercover operations where your Affiant has face-to-face meetings with Controlled and Dangerous Substance (hereinafter "CDS") dealers looking to sell and purchase varying types of CDS.

3.    In addition to entry level training, (CDS training given by the U.S. Department of Justice, Drug Enforcement Administration (DEA,) your Affiant was assigned to the following positions within the Baltimore Police Department: Northern District Patrol Division, Northern District Drug unit, Organized Crime Division Narcotics Section, and as a Task Force Officer with the ATF Violent Crime Impact Team (VCIT) working in a plainclothes capacity.

4.    Your Affiant has received over 300 hours of specialized training through several schools hosted by the Baltimore Police Department, John E. Reid and Associates, HIDTA and St. Petersburg College to include CDS enforcement; technical aspects of CDS enforcement, recognition, and identification, firearm enforcement; CDS packaging, surveillance, hidden compartments in houses and vehicles, gang trends and identification. Through these classes and seminars, your Affiant has obtained invaluable experience in the detection, identification, usage, and investigation of CDS and CDS organizations.

5.    Your Affiant has also received a bachelor's of science degree from the University of Baltimore for Forensic Studies with a concentration in Criminal

EXHIBIT 2a

USA-003803

Investigation. Completed coursework to obtain this degree included classes entitled; Specialty Warrants and Wiretaps, Fourth Amendment Applications and Interpretations, Conspiracy Investigations and Innovative Investigative Techniques. Through these classes, your Affiant has obtained valuable knowledge and experience related to complex criminal investigations.

6.      Your Affiant has participated in over 800 arrests that have resulted in the seizure of substantial amounts of heroin, cocaine, marijuana and other illegal substances. Your Affiant has authored over 100 search and seizure warrants that have led to seizures of large amounts of CDS, firearms, and U.S. Currency. Your Affiant has been a co-Affiant on one case that involved the intercept of secure communications (wiretaps).

7.      Your Affiant is familiar with the various methods used by individuals who buy and sell CDS. Your Affiant is familiar with the jargon, terminology, prices, packaging and street slang used by individuals who distribute and purchase CDS. Your Affiant has observed and/or participated in actual sales and/or undercover purchases of CDS. As a result of these observations and buys, your Affiant has arrested persons involved and seized suspected CDS. Your Affiant has been accepted on numerous occasions as an expert witness in the field of CDS packaging, identification, and methods of street level CDS distribution, including street terminology and jargon, CDS traffickers, the structure of CDS Trafficking organizations, the methods of payment, and the manner in which CDS is transported. Your Affiant has been so accepted in said areas of expertise in the United States District Court for the District of Maryland, the Circuit Court for Baltimore City, the District Court of Maryland for Baltimore City and the

EXHIBIT 2a

USA-003804

Juvenile Division of the Circuit Court for Baltimore City.

8.     Co-Affiant, Detective Kenneth Ramberg, has been a duly sworn member of the Baltimore Police Department since October 6, 1994, and is an "investigative or law enforcement officer" within the meaning of section 10-401(6) of the Courts and Judicial Proceedings Article of the Maryland Code (herein after "Courts Article"), that is, a sworn law enforcement officer of the State or a political subdivision of the State, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in Title 10 of the Courts Article.

9.     Co-Affiant, Detective Kenneth Ramberg, is currently assigned to Baltimore Police Department's Violent Crime Impact Section. Since your co-Affiant began his career as a Baltimore City police officer in 1994, he has been assigned to the following units: Central District Patrol Division, Central District FLEX Unit, Central District Drug unit, Organized Crime Division Narcotics Section, and Task Force Officer with the ATF HIDTA Project Disarm Unit. Currently your Co-Affiant is assigned to the Violent Crime Impact Section (VCIS) working in a plainclothes capacity.

10.     Your co-Affiant has received over 230 hours of specialized training through several schools hosted by the Baltimore Police Department, The Florida National Guard, HIDTA and St. Petersburg College to include CDS enforcement; technical aspects of CDS enforcement, recognition, and identification, firearm enforcement; CDS packaging, surveillance, hidden compartments in houses and vehicles, gang trends and identification. Through these classes and seminars, Detective Ramberg has obtained invaluable experience in the detection, identification, usage, and investigation of CDS and CDS organizations.

EXHIBIT 2a

USA-003805

11.     Your co-Affiant has participated in over 1000 arrests that have resulted in the seizure of substantial amounts of heroin, cocaine, marijuana and other illegal substances. Your co-Affiant has worked on several cases that involved the intercept of secure communications (wiretaps). Your co-Affiant has authored 15 wire tap (title III) investigations which resulted in the seizure of large amounts of CDS and firearms. Your co-Affiant has authored over 100 search and seizure warrants that have led to seizures of large amounts of CDS, firearms, and U.S. Currency.

12.     Your co-Affiant is familiar with the language, terminology and street slang used by persons who purchase and distribute CDS. Your co-Affiant is also familiar with the prices as well as the packaging and paraphernalia used to distribute and manufacture CDS. Your co-Affiant has conducted numerous surveillances of suspected CDS transactions on the streets of Baltimore City.   During these observations, thousands of CDS transactions have been observed resulting in the arrest of CDS violators.   Your co-Affiant has also interviewed street-level, mid-level, and CDS distributors along with CDS users, which has provided insight into drug trafficking patterns.

13.     Your co-Affiant has been accepted on numerous occasions as an expert witness in the field of CDS packaging, identification, and methods of street level CDS distribution, including street terminology and jargon, CDS traffickers, the structure of CDS Trafficking organizations, the methods of payment, and the manner in which CDS is transported. Your co-Affiant has been so accepted in said areas of expertise in the United States District Court for the District of Maryland, the Circuit Court for Baltimore City, the District Court of Maryland for Baltimore City and the Juvenile Division of the

EXHIBIT 2a

USA-003806

Circuit Court for Baltimore City.

14.   Your Affiants have learned from their training and experience that cell phones are an indispensable tool of the drug trafficking trade. CDS traffickers utilize cell phones to conduct all manner of CDS trafficking related activities, including but not limited to, contacting sources of supply to acquire new quantities of CDS, making and receiving calls from individuals that they supply with CDS, coordinating the distribution of CDS to organizational "shops" and arranging for the collection and laundering of CDS proceeds. Your Affiants have learned from their training and experience that CDS traffickers also utilize cell phones to communicate with sources of supply, shop workers and CDS purchasers through text messaging. Your Affiants have learned from their training and experience that the stored electronic communications in cell phones utilized by CDS traffickers contains the incoming and outgoing phone numbers of sources of supply, shop workers and CDS purchasers as well as text messages sent and received by the CDS trafficker's cell phone.

15.   Your Affiants submit this affidavit in support of an application for an amended order pursuant to section 10-408 of the Courts and Judicial Proceedings Article of the Maryland Code, authorizing the interception and recording of wire and electronic communications occurring over:

> the cellular telephone assigned number **443-452-3541** (CELLPHONE **443-452-3541**) bearing **UFMI# 164*1014*9291/IMSI# 316010166478723 (D-Line)**, subscribed/billed to Boost Boost, ███████, service provided by Sprint/Nextel; believed to be utilized by **Dana Bowman (AKA "New York Mike")**   and

concerning offenses enumerated in section 10-406 of the Courts and Judicial Proceedings Article of the Maryland Code, that is, offenses involving the distribution,

EXHIBIT 2a

USA-003807

possession with intent to distribute, conspiracy to distribute and conspiracy to possess with intent to distribute controlled dangerous substances in violation of Title 5 of the Criminal Law Article of the Maryland Code and the common law of Maryland.

16.    Your Affiants respectfully submit that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by persons who are the subjects of this investigation, including, among others:

> **DANA BOWMAN (AKA "New York Mike" or "Hood")**
> **DONALD WRIGHT (AKA "AZ" or "A")**
> **SHAWN JOHNSON (AKA "S" or "Fatboy")**
> **JEFF GIBBS (AKA "Jeff")**
> **KEVIN JACKSON (AKA "KD")**
> **WILLIAM HITE (AKA "Tony")**
> **MICHAEL JOHNSON (AKA "Phil")**
> **DAVID PARKER (AKA "Chief Busy Bee")**
> **and others as of yet unidentified (collectively, the "TARGET SUBJECTS").**

17.    The requested Orders are sought for a period of time until the requested interceptions fully reveal the identity of and manner in which the **TARGET SUBJECTS** engage in the above described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to section 10-408(e)(1) of the Courts Article. Pursuant to section 10-408(e)(1) of the Courts Article, it is requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten (10) days from the date of this Court's Order.

18.    This investigation is currently being conducted by Baltimore Police Department (BPD) and Drug Enforcement Administration (DEA). Your Affiants have personally participated in this investigation and make this affidavit based on their

EXHIBIT 2a

USA-003808

personal participation in this investigation, reports made to your Affiants by other law enforcement agents, telephone records, a review of consensually-recorded conversations, a review of evidence seized and documents obtained during this investigation, and debriefings of confidential informants. Except where otherwise noted, the information set forth in this affidavit has been provided to your Affiants by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever your Affiants assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom your Affiants or other law enforcement officers have spoken or whose reports your Affiants have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either your Affiants' personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

19.    As more fully described the previous affidavits, which have been *incorporated by reference*, in developing the evidence needed to successfully prosecute the above described **TARGET SUBJECTS** beyond a reasonable doubt, normal investigative procedures have been tried and failed, reasonably appear to be unlikely to succeed if tried or are too dangerous to attempt.

20.    This affidavit is being submitted for the limited purpose of securing an amended order authorizing the interception of wire and electronic communications for **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)**. Your Affiants have not included details of every aspect of this investigation to date. Facts not

8

EXHIBIT 2a

USA-003809

set forth herein are not being relied on in reaching the conclusion that orders should be issued. Nor do your Affiants request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire and electronic communications.

## TARGET OFFENSES

21.    Based upon your Affiants' knowledge of the facts and circumstances of the present investigation, it is alleged that there is probable cause to believe that the **TARGET SUBJECTS** and others as yet unknown, have committed, are committing, and will continue to commit offenses involving distribution, possession with intent to distribute, conspiracy to distribute and conspiracy to possess with intent to distribute controlled dangerous substances in violation of Title 5 of the Criminal Law Article of the Maryland Code and the common law of Maryland, hereinafter referred to as "**TARGET OFFENSES.**"

## THE TARGETED CELLULAR TELEPHONE

22.    There is probable cause to believe that some of the **TARGET SUBJECTS** of this investigation, and others as yet unidentified, are using and will continue to use, during the period of interception applied for herein, CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** to facilitate, accomplish, and commit the above-described offenses.

23.    There is probable cause to believe that these communications will reveal: (i) the nature, extent and methods of operation of the CDS trafficking activities of the **TARGET SUBJECTS** and others as yet unknown or unidentified; (ii) the identities of the

EXHIBIT 2a

USA-003810

**TARGET SUBJECTS**, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities, including the sources of supply of the controlled dangerous substances, as well as the distributors and purchasers of such controlled dangerous substances; (iii) the quantities and types of controlled dangerous substances involved in this conspiracy; (iv) the degree of participation and roles of all co-conspirators in this conspiracy; (v) the addresses and telephone numbers of all participants, so that the location of any criminal activity related to or resulting from this conspiracy to distribute controlled dangerous substances can be determined; (vi) all details about the manner of shipment or movement of controlled dangerous substances; (vii) methods of eluding law enforcement detection; (viii) the nature and scope of the drug activity; (ix) the locations of contraband and of items used in furtherance of those activities, including the location of all "stash" houses at which these controlled dangerous substances are stored; (x) the location and source of resources used to finance this illegal activity, and the location, movement and disposition of proceeds from this illicit drug activity; (xi) the times, dates, and locations of meetings at which persons involved in this conspiracy pick up CDS, exchange money, and meet to discuss the progress of the drug trafficking operation; (xii) the existence and locations of records of the drug trafficking operation; (xiii) the identification of communication devices or telephone instruments used by the **TARGET SUBJECTS** and others yet unknown, to further their illegal activities; and (xiv) other evidence necessary for the successful prosecution of the above-described participants and others as yet unknown. The acquisition of evidence relating to subparagraphs (i) – (xiv), sufficient to support guilt beyond a reasonable doubt, constitute the goals of this investigation. In addition,

EXHIBIT 2a

USA-003811

interception of these wire and electronic communications are expected to constitute admissible evidence of the commission of the offenses described above.

24.    Your Affiants have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack.    The cellular telephone system divides the Baltimore metropolitan area into many small coverage areas, which are called "cells."    As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed.    The service provider for the CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line),** Sprint/Nextel is a Communications Common Carrier (hereinafter CCC) as defined by 10-401(a) of the Courts Article, to wit a "Communications Common Carrier" means any person engaged as a common carrier for hire in the transmission of wire or electronic communications. It is requested that the authorization apply not only to the target telephone number listed above, but also to any other telephone numbers used by or assigned to the same IMSI/ESN as CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** or to any other changed IMSI/ESN assigned to the same telephone number as CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** during the same 30-day period.

25.    In connection with the CCC which provides service for CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** all

EXHIBIT 2a

USA-003812

communications over those cellular phones will automatically be routed to Baltimore, Maryland, where interception will occur regardless of where the telephone calls are placed to or from CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** during the requested wire surveillance, all monitoring will be performed in Baltimore, Maryland, by investigative or law enforcement officers as defined by Section 10-401 (6) of the Courts Article of the Maryland Code, including but not limited to Special Agents of DEA, police officers of the Baltimore Police Department, and government employees or individuals operating under a contract with the Government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

26.     Authorization is requested pursuant to section 10-408(c)(3) of the Courts Article for an amended order authorizing the interception of wire and electronic communications with regard to CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** received or sent by a communication device anywhere within the State so as to permit the interception of the communications regardless of whether the communication device is physically located within the jurisdiction of this Honorable Court. In addition, it is requested that background conversations in the vicinity of CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** while it is otherwise in use, also be intercepted. Your Affiants aver that the offenses being investigated may transpire in the jurisdiction of this Honorable Court.

EXHIBIT 2a

USA-003813

## PRIOR APPLICATIONS

27.    Your Affiants have been informed that as recently as September 29, 2010, the wire and electronic surveillance files maintained by the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and Immigration and Customs Enforcement (ICE) have been reviewed. This inquiry was conducted by contacting DEA and the Baltimore/Washington HIDTA Watch Center.  Based on these reviews, there have been no prior applications for court authorized interceptions of wire, oral or electronic communications of the **TARGET SUBJECTS** or over CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** with the exception of: The Honorable John Addison Howard, Associate Judge of the Circuit Court for Baltimore City, signed the following orders authorizing the installation and use of a Pen Register/Trap and Trace Device for cellular telephone: **410-949-4832 (A-Line)** on August 19, 2010, for **443-224-4565 (B-Line)** on September 24, 2010, for **443-992-8130 (C-Line)** on August 19, 2010 and for **443-452-3541 (D-Line)** on October 12, 2010 . On September 30, 2010 Judge John Addison Howard signed orders authorizing the interception of communications over CELLPHONE **410-949-4832/ IMSI# 310410187148454 (A-Line)** and **443-224-4565 (B-Line)**. Subsequent to the signing, AT&T Wireless notified your Affiants that the IMSI number for **A-Line** had been changed on August 29, 2010 to 310410352505492 from 310410187148454. In addition, Judge John Addison Howard signed orders authorizing the interception of communications over CELLPHONE **410-949-4832/IMSI 310410352505492    (A-Line)** and    CELLPHONE    **443-992-8130    UFMI# 164*1012*3591/IMSI# 316010159422589 (C-Line)** on October 6, 2010

13

EXHIBIT 2a

USA-003814

28.     Your Affiants hereby *incorporate by reference* the Affidavit filed in support of the Application for an Order authorizing the interception of wire communications over CELLPHONE **410-949-4832/ IMSI# 310410187148454 (A-Line)** and CELLPHONE **443-224-4565/DC#: 164*1015*1724/IMSI# 316010166550249 (B-Line)** and the Affidavit filed in support of the Application for an Amended Order authorizing the interception of wire and electronic communications over CELLPHONE **410-949-4832/IMSI 310410352505492 (A-Line)** and authorizing the interception of wire communications over CELLPHONE **443-992-8130 UFMI# 164*1012*3591/IMSI# 316010159422589 (C-Line)**.

### PROBABLE CAUSE IN SUPPORT OF THE BELIEF THAT THE TARGET SUBJECTS, AND OTHERS AS YET UNIDENTIFIED, ARE USING CELLPHONE 443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line) IN FURTHERANCE OF THE TARGET OFFENSES

### TELEPHONE TOLL RECORDS - SMS

29.     On October 12, 2010, Judge John Addison Howard of the Circuit Court for Baltimore City signed an order authorizing the installation and use of a pen register/trap and trace device for CELLPHONE **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)**, a Sprint/Nextel cellular telephone. From the time period of October 12, 2010 at 2:30 p.m. through October 13, 2010 at 12 p.m. there were 0 SMS (text message) activations.

30.     On August 19, 2010, Judge John Addison Howard of the Circuit Court for Baltimore City signed an order authorizing the installation and use of a pen register/trap and trace device for CELLPHONE **443-992-8130 UFMI# 164*1012*3591/IMSI# 316010159422589 (C-Line)**, a Sprint/Nextel cellular telephone. From September 1, 2010 through October 5, 2010 there were 104 SMS (text message) activations.

EXHIBIT 2a

USA-003815

31.     On October 6, 2010 Judge John Addison Howard of the Circuit Court for Baltimore City signed an order authorizing interception of wire communications for CELLPHONE **443-992-8130 UFMI# 164*1012*3591/IMSI# 316010159422589 (C-Line)**, a Sprint/Nextel cellular telephone. From the time period of 10/7/2010 through 10/11/2010 there were 10 text messages.

32.     Your Affiants know from their training, knowledge and experience in CDS trafficking investigations that CDS traffickers use text messages to communicate with their criminal associates to further their illicit business activities. In addition, CDS traffickers believe that the ability to erase the text messages prevents the acquisition of same by law enforcement. The quantity of text messaging being used by **Dana Bowman (AKA "New York Mike")** over **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** indicates that BOWMAN is supplementing his use of the voice feature on the TARGET PHONE with SMS messaging to conduct his CDS trafficking activity. In addition, the amount of text messages has increased during the time period of BOWMAN switching phones. Your Affiants also know that BOWMAN used the SMS function on his phone to alert others as to the change in his number. Your Affiants believe based on their training, knowledge and experience coupled with the information gained from this investigation, BOWMAN is utilizing text messaging on the TARGET PHONE in furtherance of the **TARGET OFFENSES**.

EXHIBIT 2a

USA-003816

**PROBABLE CAUSE IN SUPPORT OF THE BELIEF THAT THE TARGET SUBJECTS, AND OTHERS AS YET UNIDENTIFIED, ARE USING CELLPHONE 443-452-3541 UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line) IN FURTHERANCE OF THE TARGET OFFENSES**

33.     On October 9, 2010 at 4:39 p.m., (1639 hours), call **C-#147** was intercepted as an outgoing call to **443-722-3311** (believed to be utilized by an unknown male). The subscriber for this phone is currently unknown. The following is an excerpt from the call:

Unknown male:     Big homie.

Bowman:     Hey shorty, that number you just texted, that's my new number. I'm about to throw this one away, alright?

Unknown male:     Alright, alright.

34.     Your Affiants believe, based on their training, knowledge and experience in CDS trafficking investigations, that Bowman was contacting the unknown male to let him know that he has recently obtained a new cell phone number and will be getting rid of his current phone number (**443-992-8130 (C-Line)**).

35.     On October 11, 2010 at 2:03 p.m. (1403 hours), call **A-#258** was intercepted as an incoming call from **443-452-3541/ UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** (believed to be utilized by Dana Bowman, AKA "New York Mike"). The subscriber for this phone is Boost Boost. The call is initially answered by an unknown male, and later, Michael Johnson (AKA "Phil") speaks with the caller. The following is an excerpt from the call:

Unknown male:     Hello?

Bowman:     Hey Phil.

16

EXHIBIT 2a

USA-003817

| | |
|---|---|
| Unknown male: | Hold on. (to someone in the background) Where Phil at? (inaudible background noise) |
| Unknown male: | Yo, call him back, yo. |
| Bowman: | Hello? Hello? |
| Unknown male: | Hello? |
| Bowman: | Yeah. |
| Unknown male: | Hold yo. Here he comes. |
| Johnson: | Yo. |
| Bowman: | Yeah. |
| Johnson: | Yo. |
| Bowman: | Yo, Phil. |
| Johnson: | Huh? |
| Bowman: | Where KD at? |
| Johnson: | I think he, uh, outside. I left him outside. |
| Bowman: | Oh, he ain't around there? |
| Johnson: | No. |
| Bowman: | You don't know no numbers to that house around there he be in? |
| Johnson: | Huh? |
| Bowman: | You ain't got none of them number to where he be at around there? |
| Johnson: | Uh-uh. Uh-uh. |
| Bowman: | Alright. |

36.     Your Affiants believe based on his training, knowledge and experience that Bowman was contacting Michael Johnson (AKA "Phil") from a new telephone number and is attempting to locate Kevin Jackson (AKA "KD"), since Jackson's phone,

EXHIBIT 2a

USA-003818

443-224-4565 (B-Line) is currently out of minutes.

37. On October 11, 2010 at 4:27 p.m. (1627 hours), call **A-#313** was intercepted as an incoming call from **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** (believed to be utilized by Dana Bowman). The subscriber for this phone is Boost Boost. The following is an excerpt from the call:

Johnson:    Hello, hello?

Bowman:    (inaudible)

Johnson:    Yo, what you say?

Bowman:    Big head walking through them alleys, he parked his car on Oliver at the alley, where alley niggers run through. You should…

Johnson:    Alright.

Bowman:    Just callin' to tell you.

Johnson:    Alright.

Bowman:    Alright.

38. Your Affiants believe based on his training, knowledge and experience that Dana Bowman is contacting Michael Johnson to alert him of police presence in the area. Your Affiants know that drug dealers often give nicknames to police officers who work in the area and Bowman is alerting Johnson to the fact that a police officer, referred to as "Big Head," was attempting to covertly watch Johnson in the hopes of observing CDS activity. Your Affiants know that it is common for drug dealers to notify their co-conspirators of police presence in the area to avoid police detection and possible arrest.

39. On October 11, 2010 at 9:03 PM (2103 hours), Phone call **A- #363** was intercepted as an incoming call from **443-452-3541/ UFMI# 164*1014*9291/ IMSI#**

EXHIBIT 2a

USA-003819

**316010166478723 (D-Line)** (believed to be utilized by Dana Bowman). The subscriber for this phone is Boost Boost. The following is an excerpt from the call:

Johnson:     Yo.

Bowman:     (inaudible)

Johnson:     Huh?

Bowman:     (inaudible) around there?

Johnson:     Yeah.

Bowman:     Hey, alright, tell him I said I'm gonna come around there in like about ten, fifteen minutes, hear?

Johnson:     KD?

Bowman:     This is Mike, yo.

Johnson:     Oh.

Bowman:     Hello?

Johnson:     Uh, yea.

40.     Your Affiants believe based on his training, knowledge and experience that Dana Bowman is contacting Michael Johnson to let Kevin Jackson (AKA "KD") know that he will be coming to see him in ten to fifteen minutes. Your Affiants know that Kevin Jackson's phone, 443-224-4565 (B-Line) is currently out of minutes, which explains why Bowman would have to contact Johnson to reach Jackson. Bowman later refers to himself as "Mike," which your affiant knows is the street name for Dana Bowman.

41.     On October 11, 2010 at 10:28 p.m. (2028 hours), call **A-#366** was intercepted as an incoming call from **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** (believed to be utilized by Dana Bowman). The subscriber

EXHIBIT 2a

USA-003820

for this phone is Boost Boost. The following is an excerpt from the call:

Johnson:      Yo.

Bowman:      Hey, yo.

Johnson:      Yeah.

Bowman:      You still outside?

Johnson:      Yeah.

Bowman:      Is KD anywhere around you?

Johnson:      Yeah, he right here. Hold on.

Jackson:      (in background) What's that, Hood? I ain't talkin' to you, nigga! Yo.

Bowman:      Hey, yo.

Jackson:      Yeah.

Bowman:      Hey, yo, you can hear me, yo?

Jackson:      Who? Yeah, I can hear you.

Bowman:      Hey, yo, right. Bust this, right. I want you to, um, (inaudible) to make sure none of your little homeboys, right, on, um, what's this, Lanvale and Chapel, right?

Jackson:      Yeah.

Bowman:      Um, cause I, um, uh, I don't want anybody, I'm gonna (inaudible) until tomorrow when I come out. Cause the nigga (inaudible)

Jackson:      Hey.

Bowman:      Um, after waiting, right? Nah, he ain't gonna even do that. I'm gonna go ahead and nip this whole conversation. Real quick.

Jackson:      Where you at, yo?

Bowman:      Um, I'm about to come on, um, alright, I'm about to go home. But see, I don't know, like… matter fact, I'm about to pull up in front of Luzerne, yo.

Jackson:      Alright, no, pull up on Milton, yo. We all out on Milton, yo.

EXHIBIT 2a

USA-003821

Bowman:     Alright.

Jackson:     Alright. (in background) Hey, yo.

42.     Your Affiants believe based on his training, knowledge and experience that Dana Bowman was contacting Michael Johnson to speak to Kevin Jackson (AKA "KD") since his phone, 443-224-4565 (B-Line) is currently out of minutes. Bowman speaks with Jackson and instructs Jackson to keep his "little homeboys" (referring to those who sell CDS with/for Jackson) away from the corner of Lanvale and Chapel Street. Part of Bowman's comments are inaudible, but your Affiants believe that Bowman is describing a current conflict involving that area that he will take care of tomorrow. Bowman then meets with Jackson and Johnson on Milton Avenue to speak face to face about the issue. Your Affiants know that it is common for drug dealers to have partial conversations over the phone, only to finish the conversation in person when they are able to speak freely.

## TELEPHONE TOLL RECORDS

43.     On October 12, 2010, Judge John Addison Howard of the Circuit Court for Baltimore City signed an order authorizing the installation and use of a pen register/trap and trace device for CELLPHONE **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)**, a Sprint/Nextel cellular telephone. There have been 33 activations from 2:30 p.m. October 12, 2010 through 9:30 p.m. October 12. The contacts include known TARGET SUBJECTS.

44.     Your Affiants have also learned through toll analysis of CELLPHONE **410-949-4832/ IMSI# 310410352505492 (A-Line)**, utilized by Michael Johnson (AKA "Phil"), that during the period of October 10, 2010 through October 11, 2010, there were eight

21

EXHIBIT 2a

USA-003822

(8) contacts between CELLPHONE **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** believed to be used by Dana Bowman (AKA "New York Mike") and CELLPHONE **410-949-4832/ IMSI# 310410352505492 (A-Line).**

45.     Prior to the use of CELLPHONE **443-452-3541/ UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)**, Dana Bowman was using CELLPHONE **443-992-8130 UFMI# 164*1012*3591/IMSI# 316010159422589 (C-Line)**. An analysis of the toll records for C-Line as compared to D-Line show that most, if not all, of the contacts are common.

46.     Your Affiants know through their training, knowledge, and experience in CDS trafficking investigations, that it is a common practice for individuals that manage a large-scale street-level CDS distribution network to contact each other throughout the day with cell phones. This is important because individuals managing CDS operations need constant updates on their current supply, availability of stash locations, and any potential problems that may arise.     There is no known familial association or other relationship status between these two people that would warrant conversations two or more times a day, every day. This frequency of contact is highly indicative that the target cell phones are being used to further the conspiracy to distribute CDS.

**PROBABLE CAUSE EXISTS THAT PARTICULAR COMMUNICATIONS CONCERNING THE TARGET OFFENSES WILL BE OBTAINED THROUGH INTERCEPTION OF WIRE AND/OR ELECTRONIC COMMUNICATIONS OVER THE TARGET CELLPHONE**

47.     Your Affiants have learned from their training, knowledge and experience in CDS enforcement that CDS trafficking is not an isolated or discrete criminal offense; rather, it is characterized by an ongoing and recurring criminal nature. CDS trafficking is an illicit commercial enterprise. The facts and circumstances set forth in this affidavit

22

EXHIBIT 2a

USA-003823

establish **Dana Bowman** and other **TARGET SUBJECTS** are actively engaged in an ongoing conspiracy to traffic in CDS in Baltimore City. Your Affiants have also learned from their training, knowledge and experience in CDS enforcement that cellular telephones are an indispensable tool of the CDS trafficking trade. Cellular telephones are utilized by CDS traffickers to facilitate all aspects of the CDS trafficking trade.

48.     The facts and circumstances set forth in this affidavit demonstrate that **Dana Bowman, (AKA "New York Mike")**, has used, is using and will continue to utilize CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** in furtherance of the **TARGET OFFENSES**. Your Affiants believe, based on the totality of the information developed in this investigation, that probable cause exists and that particular communications concerning the offenses under investigation will be obtained through the interception of wire and electronic communications over CELLPHONE**443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)**.

### NECESSITY FOR INTERCEPTION OF COMMUNICATIONS
### OVER THE TARGETED CELLPHONE

### NORMAL INVESTIGATIVE PROCEDURES HAVE BEEN TRIED
### AND FAILED OR THEY REASONABLY APPEAR TO BE UNLIKELY
### TO SUCCEED IF TRIED OR ARE TOO DANGEROUS TO ATTEMPT

49.     On September 30, 2010, and again on October 6, 2010, this Honorable Court signed orders, finding, inter alia, that evidence derived from electronic surveillance was necessary for the attainment of all of the goals of this investigation as normal investigative procedures have been tried and failed, or such procedures reasonably appear to be unlikely to succeed in the future or are too dangerous to attempt.

EXHIBIT 2a

USA-003824

50.     As outlined above, the goals and objectives of this investigation are to develop evidence sufficient to identify, locate, arrest and convict beyond a reasonable doubt, the criminal confederates of the CDS trafficking organization in which DANA BOWMAN and the other **TARGET SUBJECTS** are involved.   In addition, it is the purpose of this investigation to identify the organization's suppliers and the means by which the organization obtains and receives CDS, and to determine where the organization stores CDS and how it processes and launders CDS proceeds.  It is only through the interception of wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** that the investigating agents expect to fully identify the targets that have been partially identified thus far and to fully realize the objectives of this investigation.  As indicated below, several conventional investigative techniques have been so far tried, reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve all of the goals and objectives of this investigation.

## USE OF CONFIDENTIAL INFORMANTS

51.     These affidavits are based partially on informant information that was obtained pursuant to informant debriefings. Informant information has produced limited success in achieving the goals of this investigation. While several informants have been utilized by your Affiants in this investigation and much information and evidence has been uncovered, the resulting information has failed to reveal the sources of supply, methods of distribution, locations of all stash houses, the manner of concealment and laundering of CDS proceeds and the full scope of the CDS organization involving DANA BOWMAN and the other TARGET SUBJECTS.

EXHIBIT 2a

USA-003825

52.     Since the date of the signing on September 30, 2010 (A-Line and B-Line), your affiants have attempted to use confidential informants to further obtain information regarding the BOWMAN organization. However, no further information has been obtained due to the fact that KEVIN JACKSON (AKA "KD") has no more minutes on his phone 443-224-4565 (B-Line). The confidential informant's only means of contacting DANA BOWMAN is through JACKSON. Further attempts to send confidential informants into the area to gather intelligence have been unsuccessful.

53.     All of the confidential informants have indicated that they would be reluctant to testify, based on serious concerns for their own safety. The confidential informants are familiar with some, but not all, of the **TARGET SUBJECTS** and lack the ability to enter the level of criminal activity that would provide the nature of information to prosecute DANA BOWMAN and the other TARGET SUBJECTS and others as of yet unknown. All confidential informants are cooperating for financial gain and are not currently facing any pending criminal prosecution. The confidential informants would be subject to impeachment based upon their expectation of deriving personal benefit from said testimony.

54.     For the above reasons, the use of confidential informants, alone or in combination with other conventional investigative techniques, has been tried and failed to achieve all of the goals and objectives of the investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

## UNDERCOVER OFFICERS

EXHIBIT 2a

USA-003826

55.     None of the confidential informants are in a position in relation to DANA BOWMAN and the other **TARGET SUBJECTS** that would allow for the introduction of an undercover officer/agent.  According to the confidential informants DANA BOWMAN and the other TARGET SUBJECTS would balk at meeting any person who is not previously known to them or from the areas of east Baltimore in which they frequent.  In your Affiants' experience, CDS traffickers refuse dealing with potential customers without the benefit of an introduction from a trusted customer and, therefore, the confidential informants' inability in this regard prevents further pursuing this investigative technique.  Even if the confidential informants were able to successfully introduce an undercover officer/agent for future purchases, it is your Affiants' opinion that this would not further all of the goals of the investigation.  A mere purchase of CDS by an undercover officer would not give more information as to the structure of DANA BOWMAN'S ORGANIZATION or the manner in which they import and distribute CDS. It would simply serve to verify the information that the confidential informants have already been able to impart on investigators. Additionally, from reviewing the criminal histories of DANA BOWMAN and the other TARGET SUBJECTS and their associates, your Affiants are aware of the amount of violence connected with this group. Consequently, your Affiants believe that it is too dangerous to utilize an undercover investigator to the level necessary to meet the goals of the investigation. Also, undercover detectives are often limited in buying CDS from dealers due to departmental and agency budgets.  These limitations and actions could prove fatal to the investigation and could jeopardize the safety of the undercover officer.  For those reasons, the use of an undercover officer, either alone or in combination with other conventional

26

EXHIBIT 2a

USA-003827

investigative techniques, is not here practicable or reasonably appears likely to fail if tried and is likely to be too dangerous to employ to achieve all of the goals and objectives of this investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

## ASSOCIATE COOPERATION

56.     At this stage of the investigation, interviews with the known suspects and their associates concerning the above described violations would most assuredly compromise the investigation and cause the destruction or removal of evidence. In the past, members of the Bowman Organization who have been approached or arrested by law enforcement have been very uncooperative or even hostile. Your Affiants believe members refuse to cooperate out of fear of retaliation from other members or due to the amount of loyalty within the organization. Your Affiants also believe that if investigators attempted to interview any of the **TARGET SUBJECTS** or their associates they would alert other members of possible infiltration by law enforcement. This would make it dangerous and virtually impossible to obtain evidence needed to further the goals of this investigation through this or any other investigative technique.

57.     For those reasons, obtaining the cooperation of additional associates, either alone or in combination with other conventional investigative techniques, is not practicable and reasonably appears likely to fail if tried and is likely to be too dangerous to employ to achieve the full objectives of this investigation. It is only through the interception of CDS related wire and electronic communications over CELLPHONE **443-**

EXHIBIT 2a                    USA-003828

**452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

<u>**SEARCH WARRANTS**</u>

58.     While search and seizure warrants have been helpful in the investigation and prosecution of the crimes being investigated, execution of additional search warrants at this stage of the investigation would frustrate as opposed to advance the attainment of the goals of this investigation. The search warrants that have been executed thus far have provided little evidence to help identify other members of the organization, where stash houses are located, the vehicles used in furtherance of CDS trafficking, the locations of weapons and where bank accounts and other assets of the organization may be located.   Additionally, your Affiants believe that the scope of conspiracy has not yet been fully defined and that execution of multiple search and seizure warrants at this time would alert the **TARGET SUBJECTS** and other unknown members of the conspiracy that they are currently under investigation.   Within the past year, search warrants have been executed in various target locations of the investigation with little or no result in terms of CDS recovered or targets arrested. None of the search warrants executed have furthered the investigation in terms of gaining knowledge as to the conspiracy; they have at the most, taken out of play one of numerous stash houses used by the **TARGET SUBJECTS**.   In addition, comments have been made by Bowman regarding the fact that police "can't find anything" and are frustrated, showing that he is aware of the fact that police are targeting him. Any further search warrants will simply continue to frustrate the investigation rather than adding intelligence regarding the conspiracy. Your Affiants believe, based on their training,

EXHIBIT 2a

USA-003829

knowledge and experience in CDS trafficking investigations, that the execution of multiple search warrants at this stage of the investigation would, at most, result in a temporary disruption or suspension of criminal operations by the Bowman organization, or at least result in the alteration of the methods of operation of the organization, such as disposing of cell phones currently used in furtherance of conspiratorial activities. The "dropping" of the cell phones used by the **TARGET SUBJECTS** would result in a severe setback to the progress of this investigation. The overarching goal of this investigation is to *dismantle*, not disrupt, the Bowman CDS trafficking organization.

59. For these reasons, additional search warrants, either alone or in combination with other conventional investigative techniques is not practicable, or reasonably appears to be unlikely to succeed if tried to achieve the full goals and objectives of this investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

## PHYSICAL SURVEILLANCE

60. Surveillance has been attempted on a couple of occasions to no avail in terms of furthering the investigation. On October 1, 2010, Det. Sgt. Burton was attempting to watch Dana Bowman, who was observed in the 2200 block of Oliver Street using his cell phone, but stationary surveillance could not be conducted due to pedestrian traffic as well as the fact that Dana Bowman knows the type of vehicle the police were operating.

61. Surveillance was attempted on October 6, 2010, when Det. Sgt. Burton parked his unmarked vehicle in the 1500 block of N. Regester Street. As a result of Det.

EXHIBIT 2a

USA-003830

Sgt. Burton's location, a call was received by Dana Bowman over C-Line that stated police were in the area watching Bowman and a follow up call stating that the police had left.

62.     Surveillance was attempted on October 9, 2010 at which point your Affiant, Detective Spencer, was able to follow Dana Bowman to a cell phone store, K&T Wireless at 3211 Belair Road. When Bowman left the store he was observed looking down at a cell phone in his hands, which your Affiants believe is currently being used as D-Line based on a phone call previously made over C-Line (C-20) regarding the purchase by Bowman of two 570's, which your Affiants know to be a particular model of Motorola Boost cell phones. The call was made by Bowman to 410-522-1496, which is listed to K&T Wireless at 3211 Belair Road in the white pages. Your Affiants were able to determine that Dana Bowman had purchased a new phone, but the use of surveillance has failed to gather further intelligence into the organization and their CDS trafficking.

63.     Surveillance is both dangerous and difficult in the area of east Baltimore where the Bowman Organization is currently engaged in CDS trafficking. This poses a potential risk to the investigators, the integrity of the investigation and innocent bystanders.  As indicated above, your Affiants believe that members of the organization are counter-surveillance savvy and, consequently, are very difficult targets to conduct successful surveillance.  Your Affiants believe that any attempt to conduct surveillance on the Bowman Organization or their associates would jeopardize the investigation and cause the subjects to change their pattern of activity and possibly "drop" their cell phones.  As previously discussed, prior attempts have been made to conduct

EXHIBIT 2a

USA-003831

surveillance on the **TARGET SUBJECTS** and their associates. While this surveillance did provide some useful information, it also demonstrated that the **TARGET SUBJECTS** are very surveillance-conscious. They routinely cease their activities for fear that they were being watched. Therefore, your Affiants believe that any continued attempts to conduct surveillance of this organization would frustrate the progress law enforcement has made in dismantling the criminal enterprise in Baltimore City. For those reasons, additional surveillance, either alone or in combination with other conventional investigative techniques, is not here practicable, would reasonably appear likely to fail if tried and is likely to be too dangerous to employ to achieve the full objectives of this investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** and that all of the goals of this investigation can be achieved.

## TRACKING DEVICES

64.    The past experiences of your investigators in dealing with this organization have shown that DANA BOWMAN and the other TARGET SUBJECTS and their associates are extremely aware of law enforcement's efforts to discover their illegal activity. As a result, your Affiants believe that the risk involved in placing a bumper beeper or a Global Positioning System (GPS) device on any vehicles connected to DANA BOWMAN and the other TARGET SUBJECTS or their associates would strongly outweigh any evidentiary value. Through the course of this investigation your Affiants have found that the **TARGET SUBJECTS** and their associates are known to utilize multiple vehicles in the course of their illegal activities. It is also known that DANA

EXHIBIT 2a

USA-003832

BOWMAN has access to multiple vehicles and has been known to change vehicles on a regular basis. Because these vehicles are registered to other individuals, it is possible for another driver/owner to inspect the vehicle and detect the tracking device. This person could then inform DANA BOWMAN, other TARGET SUBJECTS or their associates of the discovery, which would severely frustrate the goals of the investigation.

65. For those reasons, the use of tracking devices, either alone or in combination with other conventional investigative techniques is not practicable, and reasonably appears likely to fail if tried to achieve the full goals and objectives of this investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

## POLE CAMERAS AND/OR CCTV CAMERAS

66. Your Affiants have made use of the Baltimore Police Departments CCTV cameras in the past and have found that this technique does not prove adequately useful due to the fact that those involved in criminal activities are aware of the presence of these cameras and move their criminal activities to areas out of the view of the cameras. Your Affiants have had the opportunity to monitor and observe the CCTV cameras in the east Baltimore areas that DANA BOWMAN and other TARGET SUBJECTS frequent. In the area of Regester and Federal streets, there are no available CCTV cameras available for law enforcement use. In the area of the Milton and Hoffman streets there is approximately one (1) CCTV camera available for law enforcement to utilize. In the area of 800 Abbott Court, there is approximately one (1)

EXHIBIT 2a

USA-003833

CCTV camera available for law enforcement use. The locations of the CCTV cameras are as follows:

    1.    1100 N. Milton Avenue

    2.    800 Abbott Court

67.    The cameras are positioned in an area where its use as an investigative tool would be severely limited. These troubled areas include the alleyways off of Milton Avenue and the 2400 and 2500 block of Hoffman Street, which are out of view of the CCTV camera, making it virtually impossible for the camera to cover all possible areas. The CCTV camera located in the 800 block of Abbott Court does not allow law enforcement to view the rear exits of apartments and has a partially obstructed view by a large tree.

68.    For those reasons, the use of CCTV cameras, either alone or in combination with other conventional investigative techniques, is not practicable or reasonably appears unlikely to succeed if tried, to achieve the full goals and objectives of this investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

### GRAND JURY AND WITNESS INTERVIEWS

69.    Conducting this investigation through a Grand Jury and/or witness interviews does not appear to be a promising method of investigation. The only witnesses known to your Affiants who could provide additional evidence of the activities and the identities of the conspiracy members have themselves been identified as

33

EXHIBIT 2a

USA-003834

members of the conspiracy. All of these individuals would themselves face prosecution and, therefore, it is probable that they would invoke their Fifth Amendment privilege against self-incrimination. The only way to counter that invocation would be a grant of immunity. However, it is not desirable at this time to grant immunity to any of the identified conspirators, and thereby compel their testimony. Granting immunity to suspected co-conspirators would thwart the public policy of holding accountable those involved in criminal activities. On that basis it is your Affiants' opinion that issuing grand jury subpoenas directed to those suspected of involvement in this CDS conspiracy would not lead to the discovery of critical information at this stage. Instead, grand jury subpoenas would serve to alert conspiring members to the ongoing investigation, and thereby frustrate the purposes of this investigation.

70.     For similar reasons, conducting interviews at this point in the investigation would not be successful in obtaining evidence of the criminal activities under investigation. Only the individuals who participate in the criminal conversations or transactions are knowledgeable of their contents, making these individuals subjects of this investigation. It has been your Affiants' experience, and the experience of other agents and law enforcement officers involved in this investigation, that interviews with individuals who are involved in the sale and distribution of CDS are not productive. These individuals do not wish to disclose their own criminal activity and do not wish to implicate others, due to fear for their own safety, and/or a loyalty to other subjects of this investigation.

71.     For those reasons, the use of grand jury and witness interviews, either alone or in combination with other conventional investigative techniques, is not

EXHIBIT 2a

USA-003835

practicable or reasonably appears unlikely to succeed if tried to achieve the full objectives of this investigation. It is only through the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** that all of the goals of this investigation can be achieved.

## TELEPHONE TOLL RECORDS

72.     Analysis of telephone toll and pen register data has been used to further this investigation and has provided significant but limited information. That information has further corroborated your Affiants' opinion that CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** is being used to facilitate CDS transactions. Telephone records and/or pen register data cannot reveal the identities of the actual parties to the phone calls, the roles those parties play in this CDS conspiracy, or the actual contents of those communications. The records of calls received from and made to CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)** leave your Affiants to speculate on the actual identities of the parties to the telephone calls and to the nature of those calls. Accordingly, the use of telephone toll records, either alone or in combination with other investigatory methods discussed herein, reasonably appears unlikely to succeed in achieving all of the goals and objectives of the investigation without the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164\*1014\*9291/ IMSI# 316010166478723 (D-Line)**.

35

USA-003836

## CRIMINAL HISTORIES

73.     Anything learned from past investigations, arrests or convictions of these individuals only serves to reinforce what has been learned during the course of this investigation and does not take the place of electronic surveillance in attempting to pinpoint when the transfers of CDS occur at each level in the hierarchy, nor does it identify all of the correlative functions associated with the conduct of the CDS business.

74.     Criminal histories are only indications of past behavior.   They do not provide any insight into the current method of operation of the members of this illegal enterprise or the sources of supply.   Criminal histories are helpful in identifying individuals and showing potential connections between certain persons. It does not, however, reveal the exact nature of their criminal involvement in this CDS conspiracy. Furthermore, criminal histories and pending criminal cases do not reveal the organizational structure of the Bowman Organization.

75.     Accordingly, it is your Affiants' opinion that analyzing the criminal histories of the TARGET SUBJECTS would not, alone or in combination with other information generated over the course of this investigation, achieve all of the goals of this investigation without the interception of CDS-related wire and electronic communications over CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)**.

## MONITORING AND MINIMIZATION

76.     All interceptions will be minimized in accordance with Section 10-408(e) (3) of the Courts and Judicial Proceedings Article of the Maryland Code.   Interceptions will be suspended when it is determined through voice identification or otherwise that

EXHIBIT 2a

USA-003837

none of the named interceptees or their confederates, when identified, are participants in the conversation unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. Even if the interceptees or one of their confederates, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or otherwise related to the offenses under investigation. Every effort will be made to avoid interception of any conversation which may be protected by constitutional, statutory, or common law privilege.

## AUTHORIZATION REQUESTED

77.    Based on the foregoing, it is your Affiants' opinion that the interception of wire and electronic communications occurring over and CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** are essential to uncover the full scope of the illegal activity described herein and to achieve all of the goals of this investigation as set forth in paragraph twenty-three (23). In as much as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept wire and electronic communications not terminate when the sought wire and electronic communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

EXHIBIT 2a

USA-003838

78.     It is further requested that government personnel or other individuals who are operating under a contract with the government and acting under the supervision of investigative or law enforcement officers be authorized to conduct the interceptions, to assist in conducting this electronic surveillance, and to receive disclosure of intercepted communications.

79.     Pursuant to the provisions of section 10-408(d)(2) of the Courts and Judicial Proceedings Article of the Maryland Code, it is requested that it be ordered that **Sprint/Nextel**, the ultimate service provider for and CELLPHONE **443-452-3541 / UFMI# 164*1014*9291/ IMSI# 316010166478723 (D-Line)** and any other service providers, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits, including all incoming and outgoing called, pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise). The assistance of these providers is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the Baltimore Police Department and/or DEA.

80.     It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

William Spencer
Detective
Baltimore Police Department

Kenneth Ramberg
Detective
Baltimore Police Department

EXHIBIT 2a

USA-003839

Sworn to and subscribed before me this _13th_ day of _October_____, 2010

_____

John Addison Howard
Circuit Court for Baltimore City

EXHIBIT 2a

USA-003840